**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

**DIVISION II**

| | |
|---|---|
| In the Matter of the Parentage and Support of H.N.C. | No. 57694-5-II |
| MELISSA CURRY, | |
| Appellant, | |
| v. | UNPUBLISHED OPINION |
| MICHAEL COFFMAN, | |
| Respondent. | |

PRICE, J. — Melissa Curry appeals the trial court's final orders modifying the parenting plan for her 7-year-old daughter, H.N.C. Curry raises numerous assignments of error to support her argument that the trial court abused its discretion by modifying the parenting plan to make Michael Coffman, H.N.C.'s father, the primary residential parent. We affirm the trial court.

FACTS

I. ORIGINAL PARENTING PLAN AND RELOCATIONS

In 2019, the trial court entered a final parenting plan for H.N.C., designating Curry as the primary residential parent and providing Coffman with multiple day visits and an extended weekend visit once a month to accommodate Coffman's work schedule. The parenting plan also required both parents to provide H.N.C. a gluten-free diet.

In 2021, Curry filed a notice to relocate from the Vancouver area to the Columbia Gorge area. Coffman did not object to Curry's relocation but moved to modify the parenting plan because

the current residential schedule would not be feasible with the distance between the residences. Curry relocated to the Columbia Gorge area in July 2021.

Three months later at the end of September 2021, Coffman was offered a job as a border patrol agent with the United States Border Patrol. The job required him to attend training academy in New Mexico and then to move to Texas after his academy graduation in April 2022.

After several continuances, a one-day trial on the parenting plan modification was set for September 27, 2022.

II. TEMPORARY VISITATION ORDERS

Prior to the trial on the parenting plan modification, the trial court held multiple hearings addressing temporary orders on the parents' visitation schedule.

When Curry initially filed her notice of intent to relocate, she requested that visitation with Coffman be limited because H.N.C. exhibited behavioral problems and violence towards animals after those visits. Curry also alleged that H.N.C. now had "a preliminary diagnosis of severe ADHD [attention deficit hyperactivity disorder] and a transition[-]related Trauma and stress disorder." Clerk's Papers (CP) at 54. Curry contended that visitations with Coffman aggravated H.N.C.'s ADHD symptoms and triggered H.N.C.'s trauma. Coffman disagreed that visitations caused harm to H.N.C. and requested that his visitations be modified to give him visits every other weekend. A hearing was held on August 20, 2021.

At the hearing, Coffman proposed a temporary visitation schedule providing the exchanges for his visits take place at 7:00 p.m. at an agreed location halfway between the Vancouver area and the Columbia Gorge area. Curry raised numerous objections to Coffman's proposal, including that H.N.C. experienced "major trauma stress response" and behavioral problems after visits, that evening exchanges were unworkable because she could not see at night, and that an earlier

exchange time interfered with Curry's work schedule. Verbatim Rep. of Proc. (VRP) at 11. Ultimately, the trial court ordered visitation with Coffman every other weekend with exchanges to take place at 5:00 p.m. at the halfway point agreed to by the parties. A hearing on presentation of the temporary order was set for September 10, 2021.

At the September 10 presentation hearing, Curry raised new concerns about the order. Curry pointed out that with the modified visitation schedule and holiday schedule, Coffman would have visitations three weekends in a row, with one visit being an extended holiday weekend. Curry admitted that H.N.C. did well with her last visit with Coffman, but contended that if H.N.C. spent more than two nights at Coffman's house, she would start exhibiting violence towards animals and severe behavioral responses. Ultimately, Coffman agreed to skip a weekend of visitation but asked that H.N.C. be able to attend the birthday party he had planned for her at his house. The trial court agreed and entered a temporary parenting plan consistent with these decisions.

After Coffman was offered the position with Border Patrol in October 2021, he moved to modify visitation again. Coffman requested an extended visit in Texas at Christmas, a six-day visit to New Mexico for H.N.C. to attend his April 2022 graduation from the training academy, and weekly video calls. Curry objected to any visitation that did not occur in the Pacific Northwest. Curry claimed flying would be physically damaging to H.N.C. because she has "severely sensitive auditory canals" and flying during COVID-19 would cause extreme disruptions to her schooling because of quarantine requirements. CP at 179. Curry also insisted that if H.N.C. went to New Mexico for Coffman's graduation, Curry had to be the one to fly with her. And Curry stated that if Coffman wanted to do a video call, it had to be largely consistent with the current visitation schedule—every other weekend when his parenting time would start.

A hearing was held on October 22, 2021. At the beginning of the hearing, in response to Curry's objection to Coffman's proposed visitation, the trial court stated,

Yeah, okay. I would like you to go ahead and put your objections on the record. Well, let me tell you. I gotta stop you. Actually, this could go on forever.

So you're objecting because you think that the child, every time you get the child back, the child is suffering after seeing [her] dad—seeing the dad, father. You're objecting because you don't think the child should be able to fly. The child has every issue in the book. Ears, gluten, you name it, the child has it. And so, you think that basically, it sounds like you think that anything that has to do with anyone else besides you, the child shouldn't do. That's what it sounds like to the Court, I have to tell you. And I'm not trying to just be sarcastic.

We were here originally, because there was a motion for you to move and we—the [c]ourt allowed that move. And that was interesting because—and then—and then you didn't—then you wanted the visitation during a certain time, because you can't see well at night. The [c]ourt accommodated you there. We did all these different accommodations and then now dad's got a great job and wants to see his child and you think that that should not happen, correct?

VRP at 33-34.

Curry continued to object to Coffman's proposal, arguing that H.N.C. could not travel to Texas because she would miss at least 10 days of school due to COVID-19 quarantine because H.N.C. would not likely be vaccinated for travelling. Curry explained that H.N.C. had reactions to vaccines due to being a "ventilation genetic carrier." VRP at 36. Curry also insisted that, although H.N.C. had been doing "beautifully" on the current visitation schedule, H.N.C. could not be allowed to visit Coffman for more than two days because of her trauma and stress diagnosis and her exhibiting violence towards animals at Coffman's house. VRP at 39. Curry also argued that a video call every Saturday afternoon was disruptive and requiring hour-long video calls was too long for H.N.C. to sit still and be on the phone. Coffman responded by agreeing to move video calls to any day as long as he had a regular video call once a week.

The trial court agreed to modify the visitation schedule for Coffman's requested Christmas and graduation visits, as well as the scheduled video conferences. However, the trial court said that it would reconsider the visits if Curry presented evidence from H.N.C.'s school that the travel would require missing more than a week of school. The trial court also expressed its growing concern for H.N.C.:

> But I'm really looking forward to the trial in this case, I have to say. This—the response that we—that you bring into this courtroom causes me concern for your child. I have to indicate that as well at this point.
>
> I feel like—I feel—it does—I've got some—I'm very concerned. I'm very concerned. I've been concerned—I get concerned at each—more each time, especially when I received all of your pleadings and the things you state. I'm really concerned for your—
>
> MS. CURRY: You should be concerned. She hurts animals when she's at his house.
>
> THE COURT: I am—I am really concerned for her. I am really concerned. I'm very concerned. I'm very concerned. So, —
>
> MS. CURRY: It shows [Coffman] is in complete denial of the—
>
> THE COURT: I think somebody probably is in denial on this side. It might [be] the [c]ourt as well. But we'll get to the bottom of it when we have trial.

VRP at 40-41. When Curry continued asking what documentation she would need from the airlines or the school to convince the trial court to restrict H.N.C.'s travel, the trial court expressed further concern about Curry's insistence on restricting Coffman's visitation with H.N.C.:

> I'm very—I'm—I'm very concerned about the—the—what's happening here. At every turn, the limitations that you're trying to create for dad to have visitation with his child. And that was when he was present.
>
> So, now this is—he's—he's literally gonna be absent in the way that you wanted him to be and he is only asking for this limit. And you found every way and it's all of the health of your child. Can't travel because her ears. Can't travel because of this stress. Can't travel because there is a list a mile long. And I'm concerned about that.

VRP at 42. A hearing on presentation of the temporary orders was set for November 12, 2021.

At the November 12 hearing, Curry told the trial court she had not signed the temporary orders because she needed to change the times required for dropping H.N.C. off at the airport. Coffman also told the trial court he had recently learned that the Border Patrol had limited his time off at Christmas to only two days and he thought that was too short of a time to require H.N.C. to travel for a visit so he was willing to forego the Christmas visitation. The trial court entered modified temporary orders consistent with this agreement.

By May 6, 2022, the trial date needed to be continued, leading to another hearing. At that hearing, Coffman requested that they address a summer visitation schedule because the trial would now be moved past summer and set in September. Coffman asked for an extended summer visit from mid-June until the end of July. He supported this long duration by pointing out that H.N.C.'s six-day visit for his April graduation went very well. Curry admitted the visit for Coffman's graduation was "amazing" and "went great," but she objected to an extended summer visit. VRP at 62.

The trial court denied Coffman's request for an extended summer visit but ordered that he could have two weeks of visitation over the summer. When Curry continued discussing summertime visitation, the trial court interrupted to ask if Curry was objecting to the two weeks of visitation or the longer initially-requested, but denied, visit:

> So, I—so,—so, are you saying—is your argument no to two weeks. Just can I—I need to be clear here, because I don't want to sit here and dwell on a bunch of time. He's—he made a big jump, asked for a month or so. I want you to wait [until] I stop talking. Asked—he asked for like a month or so of visitation. I thought that was a lot, since they haven't had that type of time together and that she hasn't been away from you that long before. But two weeks was something that was a part of the parenting plan. He's—he's asked you to exercise those two weeks now. Are you telling me you'd object to that?

6

VRP at 62-63. Curry responded that two weeks was the maximum length of visitation she thought was appropriate. The trial court ordered that Coffman's summer visitation would be from June 20 through July 6.

The trial court set the trial for September 27, 2022, and a trial readiness hearing for September 6.

III. TRIAL

At the readiness hearing, the trial court discussed the logistics of the trial. The trial court noted that the parties could appear in person in the courtroom or on Zoom. But if either party chose to appear by Zoom, they needed to be sure they had a way to manage the evidence and exhibits because the trial court and court staff would not be managing evidence for the parties. Coffman was going to be represented by an attorney at the trial, Curry was going to be self-represented.

Prior to trial, Coffman filed his trial brief in which he argued that it was in H.N.C.'s best interests for the trial court to designate him the primary residential parent. Coffman also proposed two parenting plans, one if he was designated the primary residential parent and one if he remained the long-distance parent, although the actual residential schedule was the same.

A. TRIAL DAY ONE—MORNING

On the day of trial, Curry appeared by Zoom and had several issues with the audio on her computer. As these challenges became apparent, the trial court expressed concern about Curry appearing on Zoom, especially in how it would impact Curry's ability to present and admit exhibits. Curry expressed confusion about how exhibits were handled during trial and claimed nobody had explained it to her. The trial court attempted to explain to Curry how she would have

7

to handle exhibits using screen sharing on her computer. Ultimately, notwithstanding these challenges, the trial court determined that the trial needed to proceed.

Jennifer Harley, the court-appointed guardian ad litem (GAL), was the first witness. She testified that she was appointed to investigate all issues related to establishing a new parenting plan and she conducted her investigation by reviewing documents provided by the parents and third-party providers, as well as conducting interviews.

Harley testified that she reviewed approximately 100 pages of documents from the Department of Children, Youth, and Families regarding Curry. Harley identified "founded determinations" from Child Protective Services (CPS) regarding Curry's older son related to the child being medically fragile and concerns regarding Curry's mental health stability. Harley testified that Curry's son had been removed from her care due to concerns regarding neglect and malnutrition and that Curry no longer had contact with the child. Harley also identified one CPS report regarding H.N.C. which did "not screen in" for investigation. VRP at 95. Although the report was not screened in, the CPS notes on the report indicated that Curry had H.N.C. on a restricted diet due to Curry's insistence that H.N.C. had food intolerances and allergies despite medical providers stating that H.N.C. did not have any special dietary needs.

Harley testified that she reviewed H.N.C.'s medical records and determined that H.N.C. had been screened twice for Celiac disease and both screenings were negative. The medical records also noted "suspected ADHD." VRP at 99. Harley also testified that Curry indicated H.N.C. was suffering from suicidal ideation (although Harley opined that, in her experience as a GAL, it would be unusual for a six- or seven-year-old child to be experiencing suicidal ideation).

Harley further testified that Curry had claimed that Coffman refused to follow H.N.C.'s dietary restriction and was directly responsible for H.N.C.'s behavioral issues. Harley explained

8

that Curry claimed H.N.C. experienced suicidal ideation and began hurting animals when H.N.C. was in Coffman's care for more than five to seven days. However, Harley did not find any evidence that Coffman refused to comply with the dietary restrictions and Harley did not identify any behavioral issues that were attributable directly to Coffman.

Harley ultimately recommended that Coffman be designated the primary residential parent. Harley testified that Curry had had multiple jobs and residences over the last several years and that Coffman would provide more stability and decreased conflict in H.N.C.'s day to day life. And although Curry was able to meet H.N.C.'s "minimal care needs," Coffman could provide H.N.C. with an increased level of care. VRP at 107.

Curry attempted to cross-examine Harley about her investigation, but Curry struggled to present the exhibits she was attempting to refer to or ask relevant questions.

With Curry's challenges again becoming apparent, the trial court expressed concern about how Curry's decision to appear remotely by Zoom was affecting the timing of the trial and Curry's ability to participate effectively. Eventually, the trial court interrupted Curry's attempt at cross-examination and tried to redirect Curry to presenting relevant evidence:

> Okay. I'm just really quick, Ms. Curry, probably 90 [percent] of my litigants in family law are pro se. That seems odd to you maybe and I know what you've kept—keep relying on the fact that you didn't understand what procedures are this or what procedures are that.
>
> But in—in this case, I'm required to treat all parties fairly, regardless of whether they have an attorney or not. I tend to try to help pro se litigants kind of do what they're supposed to do and not necessarily hold you such—to such strict point, unless demanded by the other side, because that's the law.
>
> [Coffman's counsel] has kind of just let you go, because—probably because strategically, it's helpful to him, sorry. And I just want to let you know right now you're—you're having a hard time keeping the [c]ourt focused on the issues the [c]ourt needs to—to deal with.

9

I will also indicate to you that you so—we are at 11:00 and I've heard no testimony that's gonna be useful in my decision[-]making process. I can't understand what point you're trying to get to right now. You haven't gotten there. We've gone through a review of records of what Ms. Harley saw. We've gone—I mean we literally have not—there's not even been one piece of evidence admitted at this point.

It is 11:00. We were to start at 9:00. I know you showed up a little bit late. This case would last three weeks at this rate. You're not asking any questions that are relevant and [Coffman's counsel] is allowing it, because again, probably strategically, it's helpful to him. But you're not benefitting this [c]ourt right now.

And—and it's—it's you're wasting the judicial resources we have. So, I'm having a hard time. I need you to decide what point you're trying to make. Don't try to be sneaky or extra smart. If you have something that you want to point out that Ms. Harley has done incorrectly or something this [c]ourt wasn't able to see from her report, I mean generally, she would be off the stand by now. So, it's time for you to just get to the point on what it is that you want to get out of Ms. Harley for this trial.

VRP at 137-38. Curry's cross-examination of Harley continued for an additional half hour.

B. TRIAL DAY 1—AFTERNOON

The first witness in the afternoon was Lawrence Merrifield, the GAL appointed to investigate the original parenting plan. Merrifield testified that when he did the original investigation, Curry reported she suffered from numerous physical and mental health conditions including Celiac disease and Post-Traumatic Stress Disorder (PTSD), and she was on a number of different medications. Merrifield also testified that a psychological evaluation on Curry, performed in 2014, indicated Curry lacked insight into her own behavior.

During his investigation, Merrifield became concerned about Curry projecting health issues onto H.N.C. According to Merrifield, Curry reported H.N.C. was gluten and lactose intolerant and had Celiac disease, despite there being no medical documentation of these conditions. Merrifield also expressed concern that Curry attributed all of H.N.C.'s medical problems to Coffman even though his visitations with H.N.C. were limited.

Coffman was next to testify. He testified that, at the time of the original parenting plan, he worked a job where he was on-call 24 hours a day with only two weekend days and five weekdays off each month. In his current job as a border patrol agent, Coffman said he worked five days a week for 8 to 12 hours per day. Coffman currently owned a 2300 square foot house in which H.N.C. had her own bedroom. Coffman also got married in June 2021 to Sara Coffman.[1] Coffman also testified that when H.N.C. visited him to attend his academy graduation, she was "wonderful" on the visit and did not exhibit any behavioral concerns. VRP at 171.

Coffman explained that H.N.C. was currently on a gluten-free diet because Curry had claimed that H.N.C. had Celiac disease. When tests showed that H.N.C. did not have Celiac, Curry still insisted H.N.C. was gluten-intolerant. Coffman testified he had not seen any medical report that required H.N.C. to be on a gluten-free diet, but he maintained the gluten-free diet because it had been court-ordered in the original parenting plan as a "lifestyle choice." VRP at173. Coffman also testified that Curry claimed H.N.C. had ADHD, but there were no medical reports that definitively diagnosis her with ADHD.

Coffman further testified about how his communication with Curry influenced his relationship with H.N.C. Coffman said that Curry's constant accusations about his care of H.N.C. made him concerned to be alone with H.N.C. when no one would witness what he was doing. He also explained that Curry was often antagonistic and argumentative about Coffman exercising his visitation, and he believed Curry was trying to make it so uncomfortable for him that he would not exercise his visitation time. Coffman testified that during visits he would get a lot of emails and

---

[1] Because Michael and Sara Coffman have the same last name, we refer to Sara by her first name to avoid confusion. We intend no disrespect.

texts, and then after visits, Curry would send him messages accusing him of ruining H.N.C., of causing her pain and anguish, and of being a horrible father.

Coffman explained that if H.N.C. misbehaved, it was consistent with being a child. Generally, her misbehavior was minor and she simply had to be reminded of the rules. Coffman also described some behavior of aggression toward the animals in Coffman's house. Coffman testified that once H.N.C. had squeezed the dog's mouth shut while screaming at it. Another time, she hit the cat with a dog toy. And another time, H.N.C. kicked the dog in the yard. Despite these behavioral issues, Coffman had not seen H.N.C. exhibit any suicidal ideation.

Coffman also testified that H.N.C. decided to call his wife, "mommy Sara." VRP at 177. Then during one visit, H.N.C. was acting strangely and calling Sara names like "babysitter," "nanny," and "help." VRP at 178. When they confronted H.N.C., H.N.C. began crying because she had been "told to call her these things" and did not want to get in trouble for calling Sara "mommy Sara." VRP at 178. Coffman testified that H.N.C. is now back to calling Sara "mommy Sara."

Coffman testified that he was unable to be H.N.C.'s primary residential parent in 2019, but now he was in a position to be the primary residential parent. Coffman also believed it would be the best thing for H.N.C.

As Coffman's cross-examination was starting, the trial court took a recess to allow Curry to get her exhibits organized and prepare some questions. When the trial resumed, the trial court encouraged Curry to focus her questions on the factors related to determining a parenting plan, not her own relocation, because the parenting plan was the only relevant issue.

After Curry cross-examined Coffman, Dr. Tracy Williams, H.N.C.'s pediatrician, testified.[2] Dr. Williams testified that H.N.C. was not diagnosed with Celiac disorder. But Dr. Williams explained that he did diagnose H.N.C. with suspected gluten intolerance based on Curry's description of H.N.C.'s symptoms and reactions to gluten. Dr. Williams testified that he believed both parents cared deeply for H.N.C. and had her best interests at heart but their lack of cooperation was impacting H.N.C. Dr. Williams testified that he did not have specific concerns about Curry self-diagnosing herself or H.N.C.

The next witness was Kristen Doyle, H.N.C.'s mental health counselor for approximately seven months in 2021. Doyle testified that H.N.C. was being seen for a trauma and stress-related disorder; she explained this was a diagnosis given when a child exhibited some trauma-related symptoms but did not meet the criteria for a PTSD diagnosis. Doyle testified that the diagnosis was based on Curry's reporting about both what H.N.C. witnessed (alleged domestic violence in Coffman's home) and H.N.C.'s behavior.

Doyle also testified about one visit related to discussing H.N.C.'s violent actions toward the animals at Coffman's house. Sara told Doyle that H.N.C. was kicking and chasing the dog and claimed she did it because the dog could not hurt her back. Doyle testified that Sara thought H.N.C. was acting out because Curry would not allow H.N.C. to attend Coffman and Sara's wedding. When Doyle asked H.N.C. about the incident, H.N.C. said that she was sad because she kicked the dog and Sara made her go to bed early.

Doyle also noted that H.N.C. had difficulty with transitions. Doyle said it was difficult to predict how children would react, but historically H.N.C. experienced a period of adjustment and

---

[2] Although Dr. Williams was one of Curry's witnesses and Coffman had not concluded his case, the trial court allowed several witnesses to testify out of order to accommodate schedules.

some dysregulation in transitioning from one home to another. Doyle opined that H.N.C.'s reactions to these transitions would be helped if the parents would be supportive of each other's visitation.

As the trial continued into the afternoon, the trial court noted that the trial was obviously not going to be finished in one day, but that it had a commitment to attend a funeral at around 11:00 a.m. the next day. Given this commitment, the trial court asked the parties to consider whether they could finish within a short period of time the next morning or if they needed to set another trial day. After discussion, the trial court confirmed that the parties had decided to resume the trial the next day from 8:30 a.m. until 11:00 a.m., but another trial day would be scheduled if necessary. And given Curry's difficulties appearing remotely, the trial court told Curry she was required to appear in person for the remainder of trial.

At the end of the first day, Coffman explained he only had two witnesses remaining and their testimony would be short. Curry expressed confusion about where they were in the trial, and the trial court explained that they had taken several of her witnesses out of order, before Coffman's witnesses, to accommodate their scheduling. Ultimately, Curry stated she had no further witnesses available to call that day, but she wanted to recall the GAL Harley the next day. The trial court explained Harley had already been released from her subpoena but Curry could try to find out if Harley would be available to testify again. The trial court reiterated that only 8:30 a.m. to 11:00 a.m. was available for the next day but, if necessary, they could continue looking for additional trial days.

C. TRIAL DAY 2—MORNING

Coffman's mother, Theresa Hastie, testified that she rarely got to see H.N.C. since Coffman moved to Texas because Curry would not agree to visits with her. Hastie also flew with H.N.C.

14

to Texas for Coffman's graduation and did not observe any concerning behaviors during the trip. Hastie testified that H.N.C. "did great," "did really awesome," and had a "fun time" seeing her father and the rest of the family. VRP at 295-96. But Hastie testified that when she picked up H.N.C. to go to the airport, she had to buy her all new clothes because Curry dropped her off with a suitcase that was empty except for a stuffed animal and a blanket. During cross-examination, Curry disputed that she was obstructing visits between H.N.C. and Hastie.

Finally, Coffman called his wife, Sara. Sara testified that Coffman and H.N.C. had a great relationship and H.N.C. enjoyed being in their home. Sara also testified that H.N.C.'s visit to Texas was wonderful and she did not exhibit any behavioral issues. Sara testified that H.N.C. had her own room and bathroom at their house in Texas. And in the event Coffman was designated the primary residential parent, they had investigated the school H.N.C. would attend and had identified potential counselors for her. Finally, Sara explained she was a stay-at-home spouse so she would be able to care for H.N.C. without the need for daycare. On cross-examination, Sara testified that she had witnessed two instances of H.N.C. being violent towards animals. After Sara's testimony, Coffman stated he had no further witnesses.

As it was Curry's turn for testimony, the trial court allowed Curry, as an unrepresented party, to testify in narrative form. Curry testified that after Coffman started exercising all of his permitted visitations, H.N.C. started exhibiting violence towards animals and that H.N.C.'s behavior at daycare was so poor she was going to get kicked out. When Curry moved to the Columbia Gorge area, there was even more antagonism, contention, and chaos around visitations. Curry testified that Coffman refused to co-parent with her about medical decisions and could not be collaborative.

15

The trial court asked Curry why she believed the transitions to visit Coffman were a problem, but Curry's multiple moves over a few years did not create any problems with transitions. Curry responded that it was because her parenting relationship with H.N.C. was stable and secure and because her residential moves did not change the other dynamics in H.N.C.'s life. Curry also told the trial court that when H.N.C. returned from Coffman's house, H.N.C. said "she didn't want to live anymore." VRP at 333. Regarding Hastie's testimony about being obstructed from visits, Curry stated that H.N.C. was allowed to go visit Coffman's family but the family had not made very many requests. Finally, Curry admitted that H.N.C. had done really well after her recent visits to Texas and had not exhibited any violence towards animals in over a year.

Following Curry's testimony, the trial court expressed concern about H.N.C.'s reported suicidal ideation—specifically the lack of documentation from H.N.C.'s counselor's discussing treatment for suicidal ideation. The trial court asked Curry to have H.N.C.'s counselor write a declaration addressing H.N.C.'s treatment for suicidal ideation so the trial court could consider it before making a final decision.

As for Curry's desire to potentially recall Harley, the GAL, Curry told the trial court that she had emailed Harley but had not received a response. Notwithstanding the trial court's earlier offer to add more trial days if necessary, neither Curry or Coffman identified any further witnesses. The trial proceeded to closing arguments.

Following closing arguments, the trial court reiterated its request that Curry submit a declaration from H.N.C.'s counselor documenting treatment for the suicidal ideation. The trial court also expressed concern about Curry's attitude and questionable conduct related to visitations that Curry had not addressed in her testimony. As a result, the trial court offered Curry the opportunity to submit a declaration explaining her conduct around visitations. The trial court went

16

on to further explain the remaining concerns she had at the conclusion of trial and what additional

information she thought would be helpful to making an informed decision:

> So, I need to understand how come you think that's okay. How—how this is gonna change moving forward? And I just—I don't know what else to say. She did her visit to Texas, everybody says it was a great thing. You begged me not to let her go, and you told me she was gonna commit suicide if she went.

> So, I—and so, I did not expect the outcome to feel like this at the end of this case. I continually took your position throughout this whole process and let you set the parameters and still we ended up in this exact same space. So, no matter what we took away from dad and it was [n]ever enough. And so, I'm—I'm a little confused by that. I did not think that we would end up here.

> And I'm also surprised that you would take this case to trial, when you could have just agreed with them, and then you would have the custodial—been the custodial parent. But I think now you're willing to agree with a lot more things, because you realize that it's just not reasonable. So, I haven't made a full decision yet. I'd sure like to see some of the things that I've asked about. But I'm having a hard, you know, with kind of—I've—we've had two GALs that work in this field. . . .

> . . . .

> . . . And everyone who has looked at this from basically an interview and document process, has indicated that this is not healthy what's happening to this child. Not just because—it's not just because they're not taking on the diagnosis that—this is because you've had 99 [percent] of the parenting time and every one of the things that is wrong with this child is dad's. That's what you've done throughout this entire process.

> And that is something [Coffman's attorney], said in his closing. But it was something that I wrote down yesterday. Because it's been exactly how it's been every time we've come in—everything wrong with this kid. Every single thing has been from dad. And he has had very little parenting time. He's been limited at every—every front.

VRP at 370-71. The trial court also informed the parties that the evidence was causing her to

consider a major modification to the parenting plan:

> So, I'm having a hard—I'm struggling with this. So, it's a shift I would never plan on making in most cases, but this is the way the evidence has come out. So, I just want you to be prepared for that. And I'm hoping that you'll have some—some evidence to show that helps the [c]ourt make a more informed decision.

17

VRP at 371. The trial court also agreed the parties could submit additional evidence on whether or not Coffman's mother, Hastie, requested visits and whether those visits were refused.

After the trial court's comments, Curry asked if they were going to do another half day of trial. The trial court responded that the trial was finished. The trial court noted that Curry had said she had no other witnesses and the parties had just concluded their closing arguments, so it was unclear why Curry thought they were going to do another half day. The trial court set a hearing for its decision for October 12.

D. POSTTRIAL SUPPLEMENTAL INFORMATION

As requested, Curry supplied an additional declaration from H.N.C.'s counselor, Doyle. In the declaration, Doyle said she was aware of only one reference to suicidal ideation, noting that H.N.C. had previously exhibited "one instance of passive suicidal ideation (wishing she was dead)." CP at 312. The declaration made no mention of Doyle engaging in any specific treatment regarding the suicidal ideation. Curry also submitted an additional declaration from Dr. Williams even though the trial court did not request more information from the pediatrician.

Regarding the issue of whether Coffman's mother, Hastie, was prevented from visiting H.N.C., both parties submitted text messages which documented several requests for Hastie to see H.N.C. which were either ignored or refused by Curry.

In her own declaration, Curry addressed her presentation at trial explaining her PTSD was triggered, she was "frazzled" by attempting to manage her exhibits, and she does not handle confrontation well. CP at 296. Curry also tried to establish a backstory to her history of communication with Coffman and stated that her current way of communicating resulted from too

many years attempting to be accommodating to his controlling behavior. Finally, Curry stated that she would go to Texas if the trial court ordered H.N.C. to live with Coffman.

## IV. TRIAL COURT'S DECISION AND ORDERS

On October 12, the trial court issued its decision—the trial court designated Coffman as the primary residential parent and adopted Coffman's proposed parenting plan. The trial court recognized that it initially believed this case would be a straightforward relocation and modification:

> The trial was regarding a relocation, originally. And—and then it kind of became a modification, which that's the natural progression of a relocation. At that time, you can basically—you open the doors to all—all forms of modification.
>
> So, I wanted to first indicate that I was, you know, with these relocations, they generally go down one direction very easily. The way that the statute reads. The way that the, you know, parties are able to decide amongst themselves like can work because when I know the way the statute reads. And this case, kind of it threw me for a loop. I'll be quite honest.

VRP at 375. But after trial, the trial court felt it was necessary to consider making a major, disruptive change to the parenting plan:

> And after the trial, having—having felt that way, that was hard for me, because I know that there was—that—the decision that I felt that I should make absent getting more information, was gonna be very disruptive to the child, because it was gonna be such a big change. I asked for extra information. And the manner in which I received that information and the types of things that were said, in that the way I got that information, simply confirmed with me that I was making the correct decision here.
>
> So, originally, Ms. Curry had asked to move some 25 miles away from the location that she was. Father kind of opposed, but then withdrew his opposition. And then just asked for a parenting plan that was extremely reasonable, which again, was opposed by Ms. Curry. And then throughout the entire process, any types of reconciliation that could have occurred was—were opposed by Ms. Curry.
>
> I asked Ms. Curry, something that—and you said something from the counselor and some communication regarding visitations with grandparents during the time that the child was here without the father being present or during any of that time.

19

And what I received back, was communication—the communication being grandmother and Ms. Curry, clearly was not full, complete because when I received that complete communication, you could see that that was not actually the way the conversation went. It was just only the pieces that she wanted me to see.

Also, she had went to the counselor, must not have asked the exact question I asked, but got information that I didn't—wasn't asked for, and then, went and got information from a doctor I did not ask for any further information from.

But both parties who gave their declarations, talked about information that occurred in this trial, as if they were present in this trial, but they were not present. They received information from Ms. Curry, basically saying we had villainized her, that we had done all of these things, and they had written their things with that spin in mind, which is exactly the problem that we have here. No matter what the Court— the [c]Court puts down as a parenting plan, no matter what we're trying to do to create some type of a co-parenting situation, she finds a way to spin it her own direction.

VRP at 375-77. The trial court then explained why it determined that its decision was in H.N.C.'s

best interests:

And—and for me, I know she loves this child very much. I know she wants to take care of this child very much. But she just up and decides that she knows what's best and she's not—and she's gonna do whatever it takes to do what's best and she hasn't even, you know, taken anything into consideration when it comes—if the child is going to have the robust relationship which his—her father as she deserves to have, then she's going to need—it's not gonna happen with Ms. Curry. She's not going to allow that to happen.

And so, while this is going to be disruptive as our GAL, as she had testified in court, and—and I think, she was under the same notion, that she herself wasn't gonna be able to go this direction. That while this was gonna be a bigger disruption in the beginning, it's the only choice that one can make, because of the consistency and resiliency that was needed for this child.

. . . .

And I'm—I just want you to know, that I see you. And so, it's unfortunate, because I know that you've—think you have someone's best interest at heart. But that was not the way that you behaved at trial. It's not the way you've behaved before trial. It's not the way you've behaved since we've had trial. And it's unfortunate.

VRP at 377; 383.

The trial court also made findings on the statutory relocation factors (the trial court apparently believed that the findings were necessary because this modification was initiated by Curry's notice to relocate).

The trial court further noted that in Curry's declaration, she had volunteered her intent to move to Texas if the trial court made Coffman the primary residential parent and the trial court considered that information. As a result of Curry's potential move to Texas, Coffman suggested including two alternative residential schedules in the parenting plan, the long-distance residential schedule and an alternative residential schedule that would be in effect if Curry was living within 30 miles of Coffman. The trial court agreed and ordered that if Curry moved to Texas, the alternative residential schedule should be closer to equal parenting time.

The parties discussed when the transition of primary residency should take place. The trial court determined that it needed additional information from H.N.C.'s school in Texas to make a decision. The hearing for presentation of the final orders was set for November 4.

At the presentation hearing, it appeared there was some confusion or miscommunication around whether H.N.C. would be leaving with Coffman when he flew back to Texas. Ultimately, Coffman told the trial court he would like to arrange to take H.N.C. to Texas three days later (after school on Monday) so she would have the weekend and a last day at school to get ready to move. The trial court agreed.

The trial court entered the final written orders consistent with its oral rulings and the agreed modifications. The final order contained language finding that living with Curry was not in H.N.C.'s best interests and that Coffman should be the primary residential parent. The final order

also repeated the trial courts findings on all of the statutory relocation factors.[3] The new permanent parenting plan included joint decision-making. The parenting plan also included two alternative residential schedules as well as the modifications agreed to at the presentation hearing. The final parenting plan included a conclusion that the parenting plan was in the best interests of the child.

Curry appeals.[4]

ANALYSIS

Curry challenges the trial court's final order on the petition for relocation and the resulting parenting plan with 14 assignments of error.[5] Essentially, Curry makes four arguments. First, she argues that the trial court misapplied the "Child Relocation Act" (CRA), RCW 26.09.405-.560. Second, Curry argues that the trial court abused its discretion in determining the new parenting plan. Third, Curry argues the trial court erred by ordering H.N.C. to change residences with only three days' notice. And fourth, Curry argues the trial court erred by shortening the trial to attend a funeral. We affirm the trial court's final orders.

---

[3] The final orders were drafted by Coffman's counsel.

[4] Following entry of the final orders on appeal, the trial court held additional hearings and entered orders related to a dispute regarding changing H.N.C.'s therapist. These orders do not fall within the scope of review of the final order and final parenting plan. *See* RAP 2.4. Further, Curry did not move for discretionary review nor did she assign error to these orders.

[5] In his brief, Coffman moves to strike Curry's opening brief for failure to comply with the court rules, specifically the rule requiring citation to the record. RAP 10.3(a)(5) ("Reference to the record must be included for each factual statement."). We deny Coffman's motion to strike Curry's brief in its entirety. However, the facts relied on in this opinion are supported by the record designated in this case, and we do not consider any factual statement in Curry's brief that is not supported by the record.

I. STANDARD OF REVIEW

We review a trial court's decision related to the welfare of children for an abuse of discretion. *In re Marriage of Laidlaw*, 2 Wn. App. 2d 381, 386, 409 P.3d 1184, *review denied*, 190 Wn.2d 1022 (2018). A trial court abuses its discretion when its decision is manifestly unreasonable or based on untenable grounds or reasons. *Id.* " 'A court's decision is manifestly unreasonable if it is outside the range of acceptable choices, given the facts and the applicable legal standard; it is based on untenable grounds if the factual findings are unsupported by the record; it is based on untenable reasons if it is based on an incorrect standard or the facts do not meet the requirements of the correct standard.' " *Id.* (quoting *In re Marriage of Littlefield*, 133 Wn.2d 39, 47, 940 P.2d 1362 (1997)).

Decisions in family law actions will seldom be changed on appeal. *See In re Marriage of Landry*, 103 Wn.2d 807, 809, 699 P.2d 214 (1985). The courts have recognized,

> Such decisions are difficult at best. Appellate courts should not encourage appeals by tinkering with them. The emotional and financial interests affected by such decisions are best served by finality.

*Id.* And because the trial court hears the evidence firsthand and has a unique opportunity to observe the witnesses, we are " 'extremely reluctant to disturb child placement dispositions.' " *In re Parentage of Schroeder*, 106 Wn. App. 343, 349, 22 P.3d 1280 (2001) (quoting *In re Marriage of Schneider*, 82 Wn. App. 471, 476, 918 P.2d 543 (1996), *overruled on other grounds by Littlefield*, 133 Wn.2d 807).

II. APPLICATION OF THE CRA

Curry argues that the trial court abused its discretion by misapplying the CRA. Curry appears to argue that the trial court actually denied her relocation and, therefore, did not have authority to modify the parenting plan. Alternatively, Curry argues that the trial court conflated

the requirements for relocation with the requirements for modifying a parenting plan. Although we recognize the written findings in the final orders appear to conflate the decision on relocation and the decision on modification, we disagree that any legal error occurred.

The CRA provides certain notice requirements and standards for changing the primary residence of a child who is the subject of a court order regarding residential time. *See* RCW 26.09.405-.560; *Laidlaw*, 2 Wn. App. 2d at 386. " 'If a person entitled to residential time or visitation objects to a child's relocation, the person seeking to move the child may not relocate the child without court approval.' " *Laidlaw*, 2 Wn. App. 2d at 386-87 (quoting *In re Marriage of McNaught*, 189 Wn. App. 545, 553, 359 P.3d 811 (2015)). The CRA establishes a rebuttable presumption that the relocation will be permitted. RCW 26.09.520. The CRA also provides 11 factors the trial court should consider to determine whether the detrimental effects of relocation outweigh the benefits to the child and the relocating parent. RCW 26.09.520(1)-(11).

A party who is entitled to residential time with the child may file an objection to either the relocation or the relocating parent's proposed revised residential schedule. RCW 26.09.480. If no objection to the relocation is filed, then the relocation shall be permitted. RCW 26.09.500. Even if a parent does not object to the relocation, the parent retains the right to move for modification of the parenting plan under RCW 26.09.260. RCW 26.09.500(3).

RCW 26.09.260(6) governs modification of a parenting plan in relation to a relocation and permits the trial court to entertain a change in the primary residential parent when a relocation is requested:

> The court may order adjustments to the residential aspects of a parenting plan pursuant to a proceeding to permit or restrain a relocation of the child. The person objecting to the relocation of the child or the relocating person's proposed revised residential schedule may file a petition to modify the parenting plan, *including a change of the residence in which the child resides the majority of the time*, without

24

a showing of adequate cause other than the proposed relocation itself. A hearing to determine adequate cause for modification shall not be required so long as the request for relocation of the child is being pursued. In making a determination of a modification pursuant to relocation of the child, the court shall first determine whether to permit or restrain the relocation of the child using the procedures and standards provided in RCW 26.09.405 through 26.09.560. Following that determination, the court shall determine what modification pursuant to relocation should be made, if any, to the parenting plan or custody order or visitation order.

(Emphasis added.) Essentially, a relocation is all that is required for modification of the parenting plan because "[r]elocations involve new time and distance factors that will inevitably require dramatic changes to a parenting plan." *In re Marriage of Fahey*, 164 Wn. App. 42, 68, 262 P.3d 128 (2011), *review denied*, 173 Wn.2d 1019 (2012). " '[A] trial court need not support each term of a parenting plan with specific factual findings. Rather, a trial court has broad discretion to structure a parenting plan, guided by the provisions of the applicable statutes.' " *Laidlaw*, 2 Wn. App. 2d at 388 (alteration in original) (quoting *McNaught*, 189 Wn. App. at 563).

Here, although the trial court's ruling somewhat blurs the distinction between the relocation *of the parent* and the modification of the residential time in the parenting plan *for the child*, there was no error. Curry initiated the current *proceedings* by filing a notice of relocation to move from Vancouver to the Columbia Gorge area without filing any proposed revised residential schedule. In response, Coffman did not object to the relocation, but he petitioned for modification of the parenting plan in order to address changes necessitated by Curry's relocation. Thus, because Coffman did not object, the relocation was permitted based on RCW 26.09.480 and RCW 26.09.500. And, in fact, Curry relocated to the Columbia Gorge area early on in the proceedings. But the issue of Coffman's responsive request for modification of the parenting plan remained. And the trial court made clear throughout the proceedings that the only issue before it was the modification of the parenting plan because there was no objection to Curry's relocation.

We recognize that some of the trial court's language in the final order appears to discuss relocation; the trial court's order appears to discuss the child's move to the Columbia Gorge area separately from Curry's move. *See* CP at 323 ("The court allowed the child to temporar[il]y move with Mother while Father continued to seek a change in the parenting plan regarding who the primary residential parent would be."), CP at 326 ("The child may not move with Mother on a permanent basis and father shall be the primary residential parent."). Although this language in the order can be read to suggest the trial court was improperly focused on whether to allow the *relocation*, rather than being focused on the *parenting plan modification*, we disagree that this is the correct interpretation. Based on the history of the case—including the fact that Curry had already relocated—and the trial court's oral rulings, it appears the language in the order is simply inartful in expressing the trial court's intent to decide modifications to the parenting plan *as initiated by* Curry's request for relocation to the Columbia Gorge area. Further, because relocation focuses on where the parent will reside, while modification of the parenting plan and residential schedule focuses on where the child will reside, the trial court's clear focus on where H.N.C. will reside demonstrates the trial court was deciding the correct issue—the modification to the residential schedule in the parenting plan, rather than whether to allow the relocation.

In addition to its inartful language, the trial court's order also appears to contain unnecessary findings that further blurs this issue. The order includes findings under each of the factors for relocation under RCW 26.09.520(1)-(11); by including these findings, it appears the trial court believed these findings were necessary because the current action was initiated by Curry's notice to relocate. But because the relocation was permitted and had, in fact, already occurred, the trial court was not required to make findings under these relocation factors. And the trial court was not required to make additional findings supporting its authority to consider

modification of the parenting plan under these circumstances because relocation, by itself, is enough to modify a parenting plan under RCW 26.09.260(6). Because the trial court's relocation findings were unnecessary, they were superfluous, not a legal error.[6]

Ultimately, we conclude all of the trial court's actions were consistent with the statutory scheme governing modification of a parenting plan in relation to a relocation. Although the final written orders contained inartful language and superfluous findings under the relocation statute, there was no legal error that demonstrates an abuse of discretion requiring reversal of the parenting plan. Accordingly, the trial court did not abuse its discretion by misapplying the requirements of the CRA.

III. MODIFICATION OF THE PARENTING PLAN

Curry next argues that the trial court abused its discretion in determining the new parenting plan because it was not in H.N.C.'s best interests to make Coffman the primary residential parent. We disagree.

The trial court exercises broad discretion when it develops a parenting plan. *In re Marriage of Katare*, 175 Wn.2d 23, 35, 283 P.3d 546 (2012). The trial court must allocate parenting responsibilities in the best interests of the child. RCW 26.09.002. RCW 26.09.187 provides factors for the trial court to consider when determining decision-making authority and the child's

---

[6] We also note that the trial court was not required to make findings regarding Coffman's move to Texas because, at the time of his move, Coffman was not the person with whom the child resided the majority of the time nor did he have substantially equal residential time. Therefore, the requirements of the CRA did not apply to Coffman's move to Texas. *See* RCW 26.09.430. Further, Coffman's move to Texas was not a change in H.N.C.'s principal residence. *See* RCW 26.09.410(2) (" 'Relocate' means a change in principal residence either permanently or for a protracted period of time, or a change in residence in cases where parents have substantially equal residential time as defined by RCW 26.09.525.").

residential schedule. RCW 26.09.187(2), (3).[7] Specific findings on the statutory factors are not

required when evidence regarding the statutory factors is presented to the trial court and the trial

---

[7] RCW 26.09.187(3) provides,

RESIDENTIAL PROVISIONS.

(a) The court shall make residential provisions for each child which encourage each parent to maintain a loving, stable, and nurturing relationship with the child, consistent with the child's developmental level and the family's social and economic circumstances. The child's residential schedule shall be consistent with RCW 26.09.191. Where the limitations of RCW 26.09.191 are not dispositive of the child's residential schedule, the court shall consider the following factors:
    (i) The relative strength, nature, and stability of the child's relationship with each parent;
    (ii) The agreements of the parties, provided they were entered into knowingly and voluntarily;
    (iii) Each parent's past and potential for future performance of parenting functions as defined in RCW 26.09.004(3), including whether a parent has taken greater responsibility for performing parenting functions relating to the daily needs of the child;
    (iv) The emotional needs and developmental level of the child;
    (v) The child's relationship with siblings and with other significant adults, as well as the child's involvement with his or her physical surroundings, school, or other significant activities;
    (vi) The wishes of the parents and the wishes of a child who is sufficiently mature to express reasoned and independent preferences as to his or her residential schedule; and
    (vii) Each parent's employment schedule, and shall make accommodations consistent with those schedules.
    Factor (i) shall be given the greatest weight.

(b) Where the limitations of RCW 26.09.191 are not dispositive, the court may order that a child frequently alternate his or her residence between the households of the parents for brief and substantially equal intervals of time if such provision is in the best interests of the child. In determining whether such an arrangement is in the best interests of the child, the court may consider the parties geographic proximity to the extent necessary to ensure the ability to share performance of the parenting functions.

(c) For any child, residential provisions may contain any reasonable terms or conditions that facilitate the orderly and meaningful exercise of residential time by a parent, including but not limited to requirements of reasonable notice when residential time will not occur.

court's decision reflects consideration of the relevant factors. *In re Parenting & Supp. of C.T.*, 193 Wn. App. 427, 443, 378 P.3d 183 (2016).

On appeal, we do not reweigh the evidence or review the trial court's credibility determinations. *In re Marriage of Black*, 188 Wn.2d 114, 127, 392 P.3d 1041 (2017).

Here, after reviewing the whole record, it is evident that the trial court's paramount concern was H.N.C.'s best interests and maintaining stable and nurturing relationships with both of her parents, especially after it started to appear to the trial court that Curry's concerns about Coffman were unsubstantiated. Throughout this entire case, Curry insisted that limited visitation with Coffman was necessary to protect H.N.C.'s physical and mental health, despite presenting no evidence establishing that H.N.C. suffered from any specific physical or mental illness. Any evidence of suspected or provisional diagnoses were based on Curry's own reports of H.N.C.'s behavior. With the exception of the testimony regarding a few specific instances of H.N.C. hurting the animals at Coffman's house, there was no evidence documenting the severe behavioral problems that Curry repeatedly attributed to H.N.C. visiting her father. Further, despite all accounts establishing that the visitation H.N.C. did have with Coffman went extremely well, Curry continued insisting that Coffman should only be permitted short visits. Because of Curry's continued insistence, without factual support, on interfering with Coffman's visitations and his relationship with H.N.C., the trial court's determination that it was in H.N.C.'s best interests to make Coffman the residential parent in order to nurture that parent-child relationship was not manifestly unreasonable or based on untenable grounds or reasons.[8]

---

[8] Further, this is consistent with consideration of RCW 26.09.187(3)(i) ("The relative strength, nature, and stability of the child's relationship with each parent."), which is the factor to be given the greatest weight in considering a parenting plan.

Moreover, the trial court's comments make it clear that the trial court recognized that transitioning the primary residential parent was going to have some detrimental effect on H.N.C.'s well-being. The trial court considered the detrimental effect of the residential shift in light of the potential benefits—increasing the stability of H.N.C.'s relationship with Coffman, potentially reducing interference and conflict around visitation, and lessening the potential harm of Curry's preoccupation with H.N.C.'s alleged physical and mental conditions. And the trial court recognized that at this point in H.N.C.'s life, such a transition would likely be easier than addressing further harm to Coffman's relationship with H.N.C. or effecting such a large change later. The trial court is in the best position to weigh the competing considerations in this case and, therefore, we must be extremely reluctant to change the trial court's child placement decisions. *Schroeder*, 106 Wn. App. at 349. Because the trial court carefully considered the harms, benefits, and consequences of its decision in light of the testimony that it heard, the trial court did not abuse its discretion in modifying the parenting plan to designate Coffman as the primary residential parent.

Curry's arguments to the contrary primarily relate to the trial court's weighing of evidence or credibility determinations and are unpersuasive. First, Curry claims that the trial court abused its discretion by failing to consider relevant facts, evidence, and testimony from experts. But the trial court carefully considered evidence from all three experts in this case, the GAL Harley, the pediatrician Dr. Williams, and the counselor Doyle. And although neither Dr. Williams nor Doyle labeled Curry's actions as unreasonable, neither expert substantiated her claims regarding H.N.C.'s alleged physical and mental health conditions or offered any firsthand observations of the symptoms and behaviors Curry reported. Further, the trial court clearly valued Doyle's role as H.N.C.'s counselor because it requested follow-up information from Doyle to address the concerns

regarding suicidal ideation. However, the additional information included only a single report from Curry of passive suicidal ideation and did not establish H.N.C. was currently suffering from, at immediate risk from, or undergoing treatment for, suicidal ideation. There is nothing in the record that establishes the trial court disregarded credible evidence or that its decision was not based on the evidence.

Second, Curry argues that the trial court abused its discretion by considering Curry's statement that she would move to Texas if Coffman became the primary residential parent. However, Curry voluntarily provided that information in a declaration she submitted specifically for the trial court's consideration. It is not improper for the trial court to consider information it was specifically asked to consider by a party.

Third, Curry argues that the trial court erred by finding Coffman credible.[9] We do not review credibility determinations. *Black*, 188 Wn.2d at 127. And to the extent Curry is alleging

---

[9] Curry also argues that the trial court abused its discretion by applying the "friendly parent" concept, which has been defined as when "primary residential placement is awarded to the parent most likely to foster the child's relationship with the other parent." *In re Marriage of Lawrence*, 105 Wn. App. 683, 687, 20 P.3d 972 (2001). The friendly parent concept is often reflected in pieces of legislation which apply it as a presumption or specific factor to be considered in order to ensure that the child will have frequent and continuing contact with both parents. *Id.* In Washington, the legislature has repeatedly declined to adopt this policy, and therefore, the friendly parent concept is not the law in this state. *Id.* at 687-88

Curry's argument is unpersuasive. Neither party argued that the placement should be made consistent with the friendly parent concept. Further, nothing in the record suggests that the trial court made its decision based on the mistaken belief that it was required by this concept to ensure that H.N.C. had frequent and continuing contact with both parents. Instead, as explained above, the trial court clearly made its decision based on what it determined to be in H.N.C.'s best interests considering the nature of her relationship with both parents as well as the effect of Curry's conduct on H.N.C.'s well-being.

that Coffman's testimony was directly contradicted by medical records, there were no medical records admitted as evidence at trial.

Fourth, Curry assigns error to several findings of fact that the trial court made regarding the statutory relocation factors. As explained above, the specific findings regarding the statutory relocation factors are superfluous in this case. And we have already concluded that the trial court did not abuse its discretion in designating Coffman as the primary residential parent. Accordingly, we do not further address Curry's assignments of error challenging specific findings of fact related to the relocation factors.

In the end, the trial court was faced with a difficult decision. Because the trial court is in the best position to observe the parties and the witnesses, we will not review the trial court's credibility determinations. *Id.* And here, based on those credibility determinations and careful consideration of the evidence, the trial court determined that placement with Coffman as the primary residential parent was in H.N.C.'s best interests. Absent a legal error or an abuse of discretion, we are extremely reluctant to change a trial court's placement decisions. *See Schroeder*, 106 Wn. App. at 349. Accordingly, we affirm the trial court's permanent parenting plan designating Coffman as the primary residential parent.

IV. ADDITIONAL ISSUES

Curry's third and fourth arguments are that the trial court erred by ordering H.N.C. to change residences with only three days' notice, and that the trial court erred by shortening the trial to attend a funeral. Neither argument establishes Curry is entitled to relief.

A. TRANSFER OF CUSTODY FOR H.N.C.

Curry contends that the trial court abused its discretion when it gave only three days of notice before Coffman received custody of H.N.C. after the November 4 presentation hearing. Because this issue is moot, we decline to review it.

An issue is moot if a court can no longer provide effective relief. *See Maldonado v. Maldonado*, 197 Wn. App. 779, 790, 391 P.3d 546 (2017). An issue that is moot is dismissed. *See* RAP 18.9(c).

Here, the transfer of custody from Curry to Coffman has already occurred. While we empathize with the difficulties of an abrupt transfer of the primary residential parent, there is no relief that we can provide, so Curry's challenge to the limited notice of the transfer is moot. Accordingly, we do not address this issue.

B. TRIAL SCHEDULING

Finally, Curry argues that the trial court improperly shortened the time for trial in order to accommodate the trial court's plans to attend a funeral. We disagree.

"Trial courts have the inherent authority to control and manage their calendars, proceedings, and parties." *State v. Gassman*, 175 Wn.2d 208, 211, 283 P.3d 1113 (2012).

Here, the trial court's decision was not improper. The trial was originally scheduled to be one day. Because of complications resulting from Curry appearing for trial remotely, the trial court recognized that one day was going to be insufficient. But the trial court had a prior obligation to attend a funeral the afternoon of the next day and asked the parties if they needed additional time for trial. The trial court had the inherent authority to manage its calendar in order to attend a funeral. Further, because the trial court offered the parties more time for trial but both parties represented they had no further witnesses and proceeded to closing argument, the trial court did

not abuse this inherent authority by concluding the trial when it did, rather than proceeding to another half day of trial. Moreover, the trial court gave Curry additional time to present declarations addressing the issues the trial court was most concerned about during trial. There was nothing improper about the trial court's decision exercising its inherent authority to manage its calendar.[10]

---

[10] Curry also appears to make three additional arguments about the trial court. First, it appears that Curry is arguing that the trial court was so affected by grief related to the funeral on the second day of trial that the trial court was unable to properly conduct the trial or properly consider the evidence. However, there is no evidence in the record before us that supports this contention. Accordingly, we do not consider it.

Second, Curry argues that the trial court discriminated against her based on how Curry's ADHD and PTSD affected her presentation at trial. However, although Curry referenced her ADHD and PTSD, she did not make any request for accommodation under GR 33. And the trial court's comments repeatedly demonstrated that the trial court was trying to understand Curry's position and carefully considering Curry's allegations. For example, when Curry alleged that H.N.C. was suffering suicidal ideation, the trial court appeared to urgently request additional information so she could understand the extent of the problem and how it should affect her decision. Curry fails to demonstrate that the trial court discriminated against her based on how her ADHD and PTSD affected her presentation at trial.

Third, Curry argues that the trial court was biased against her. Although the trial court expressed its frustration with the way trial was being handled (and we encourage all trial courts to limit expressions of frustration, *especially towards unrepresented parties*), a full review of the record demonstrates that the trial court's conduct was limited to just that—frustration with the amount of time the trial was taking. Notwithstanding that some of these expressions of frustration were unfortunate and perhaps unnecessary, the trial court repeatedly demonstrated concern for reviewing all of the evidence in the case, for exploring the issues in the case, and for attempting to understand the positions of both parents. Expressions of frustration, by themselves, do not show the trial court was biased. *See Tacoma S. Hosp., LLC v. Nat'l Gen. Ins. Co.*, 19 Wn. App. 2d 210, 218, 494 P.3d 450 (2021) (To overcome the presumption that a trial judge acts without bias or prejudice, the party raising the challenge must identify specific facts raising at least a suspicion of bias or partiality, such as a personal or pecuniary interest in the outcome of the proceedings.), *review denied*, 198 Wn.2d 1041 (2022). Curry has offered no specific facts of bias; rather, the record demonstrates that the trial court struggled with, and thoroughly considered, the difficult decision it made in this case. Accordingly, Curry's argument of bias fails.

V. ATTORNEY FEES

Coffman requests attorney fees on appeal as sanctions for Curry filing a frivolous appeal under RAP 18.1. However, because Coffman references his request for attorney fees in the conclusion section of his brief, Coffman fails to comply with the requirements of RAP 18.1(b) to present the request for attorney fees in a separate section of his brief. Further, RAP 18.1(a) allows us to award attorney fees "[i]f applicable law grants to a party the right to recover reasonable attorney fees or expenses on review . . . ." And Coffman identifies no applicable law that grants him the right to recover attorney fees. Accordingly, Coffman's request for attorney fees is denied.

CONCLUSION

The trial court did not misapply the CRA or abuse its discretion in determining the new parenting plan. Finally, Curry's challenge to the timing of the transfer of custody is moot and the trial court did not improperly shorten the trial. Accordingly, we affirm the trial court. And we deny Coffman's request for attorney fees on appeal.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

PRICE, J.

We concur:

GLASGOW, P.J.

CHE, J.